**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**


David R. Venzke,                                          Case No. 3:17CV1031

              Plaintiff

      v.                                          **ORDER**

Black Stone of Northwest Ohio, et al.,

              Defendants


      This is a breach-of-contract suit.

      In 2014, plaintiff David Venzke sold his home healthcare company, Nursing Resources

Corporation (NRC) to the defendant, Black Stone of Northwest Ohio (Black Stone NWO).

      As part of the sale, Venzke agreed to receive five percent of the purchase price as a share

of "phantom equity" in NRC. Venzke's phantom equity was on its face worthless, but it could

become valuable if certain contingencies occurred. For its part, Black Stone NWO agreed to pay

Venzke an earnout that ranged from $200,000 to $625,000 if NRC's adjusted earnings before

income, depreciation, taxes, and amortization (EBITDA) for fiscal year 2015 was at least

$600,000. Finally, Venzke warranted to Black Stone NWO that all of NRC's accounts receivable

were collectible, that the company had no pending claims against it, and that there were no

undisclosed liabilities.

      Within a year after the sale, multiple disputes had arisen between the parties.

      Venzke initially claimed that Black Stone NWO breached the parties' contracts by

refusing to pay him for his phantom equity interest and denying him an earnout. Black Stone

NWO counter-claimed that Venzke breached the warranties he had made to NRC. After unsuccessfully trying to mediate their disputes, Venzke brought this lawsuit.

Jurisdiction is proper under 28 U.S.C. § 1332(a)(1).[1]

Pending is Black Stone NWO's motion for summary judgment. (Doc. 24). For the following reasons, I grant the motion in part and deny it in part.

## Background

Before its sale to Black Stone NWO, NRC provided home healthcare services in Northwest Ohio. (Doc. 28–1, PageID 628).

Black Stone Companies of Ohio (Black Stone) is a holding company that "established a structure for providing home health care through shared administration supporting revenue-generating operating entities." (Doc. 24–2, PageID 178). It relies on a separate entity, Black Stone Operations, LLC, to "provide[ ] administrative services to multiple regional operating entities" that delivered home healthcare services throughout Ohio. (*Id.*, PageID 179).

"The Black Stone structure provided advantages for attracting investors and providing services with economies of scale enabled by shared administrative services" from Black Stone Operations. (*Id.*).

### A. Acquisition

In 2013, Black Stone planned an expansion into Northwest Ohio. (Doc. 24–2, PageID 179). It identified NRC as a "potential acquisition target." (*Id.*).

---

[1] Venzke is a citizen of Florida, and Black Stone NWO is a citizen of Kentucky. (Doc. 1, PageID 1; Doc. 36, PageID 759). A second defendant, Almost Family, Inc., is a citizen of Delaware and Kentucky. (Doc. 1, PageID 1–2). Although complete diversity did not exist when Venzke filed his complaint, his subsequent dismissal of Almost Family under Fed. R. Civ. P. 21 (Doc. 4) cured the jurisdictional defect, and my diversity jurisdiction over this case is secure. *Grupo Dataflux v. Atlas Glob. Consulting Grp., Inc.*, 541 U.S. 567, 570–71 (2004); *AmSouth Bank v. Dale*, 386 F.3d 763, 777–78 (6th Cir. 2004).

In March, 2014, Black Stone NWO and Venzke executed a Stock Purchase Agreement. (Doc. 24–3). Black Stone NWO agreed to purchase NRC's shares for $3.75 million. The purchase price represented NRC's 2012 EBITDA multiplied by five. (Doc. 1–1, PageID 18; Doc. 24–2, PageID 179).

### 1. Phantom Equity Agreement

Venzke agreed to receive part of the purchase price in the form of a phantom equity interest in Black Stone NWO that entitled him to certain "economic rights" as specified in the parties' Phantom Equity Agreement. (Doc. 1–2, PageID 56). Venzke's phantom equity interest in Black Stone NWO, which the parties also refer to as the "Grantee's Percentage," was five percent. (*Id.*).

Of particular relevance to Venzke's claims, the Phantom Equity Agreement provided that, in the event of a "Change of Control" – that is, a merger of Black Stone NWO with or into another entity (Doc. 1–2, PageID 56) – Venzke would be "entitled to receive an amount equal to the product of Grantee's Percentage, as of the date of the Change of Control, multiplied by the Gross Proceeds." (*Id.*).

According to the Phantom Equity Agreement, "Gross Proceeds"

> means (as determined in good faith by Black Stone) (a) (i) the total amount payable (and paid) in cash and the value of securities received for the equity of Black Stone in connection with any Change of Control, or (ii) (A) the total amount payable (and paid) in cash and the value of securities received for the assets of Black Stone in connection with any Change of Control minus (B) all liabilities, obligations and other indebtedness of Black Stone not assumed or taken subject to by the buyer * * *; in each case, minus (b) the sum of the transaction costs associated with the change of control. * * * Black Stone shall have the authority to establish reasonable reserves or make other equitable adjustments, in good faith, to the foregoing calculation (e.g., to take into account unforeseen factors or to satisfy fixed or contingent liabilities or obligations of Black Stone).

(*Id.*, PageID 57).

## 2. Earnout Agreement

The Stock Purchase Agreement specified that part of the purchase price for NRC's shares would be calculated and paid as an earnout. Under the parties' separate Earnout Agreement, Venzke would be entitled to a graduated sum if NRC's "Adjusted EBITDA" equalled or exceeded $800,000 during fiscal year 2015. (Doc. 1–3, PageID 63).

The Earnout Agreement further provided that, "[p]romptly following the end of the Earnout Period [*i.e.*, 2015]," Black Stone NWO was to prepare: 1) "a consolidated income statement of the Company for the Earnout Period"; and 2) a "Computation Notice," defined as "a computation of EBITDA and Adjusted EBITDA, showing separately each of the adjustments made to EBIDTA to arrive at Adjusted EBITDA." (Doc. 1–3, PageID 65). Although the contract required that Black Stone NWO deliver both documents to Venzke "within 90 days following the end of the Earnout Period" (*id.*), the Earnout Agreement did not give Venzke a remedy if Black Stone NWO failed to deliver the notices within that period.

## 3. Escrow Agreement

The parties also executed an Escrow Agreement. (Doc. 24–2). Under this contract, Black Stone NWO put $200,000 of the purchase price in escrow for the payment of claims against Black Stone NWO arising from Venzke's breach of the warranties discussed below.

## 4. Venzke's Warranties

As part of the Stock Purchase Agreement, Venzke made several warranties to Black Stone NWO. In particular, Venzke warranted that: 1) all of NRC's accounts receivable had been or could be collected in full within ninety days after becoming due; 2) NRC had no undisclosed liabilities; and 3) there was no pending "Proceeding" against NRC beside those set forth in the Stock Purchase Agreement. (Doc. 1–1, PageID 19, 32, 35, 36). Venzke further agreed to

indemnify and hold Black Stone NWO harmless from any breach of these warranties. (*Id.*, PageID 44).

## B. Post-Acquisition Developments

Once the sale had closed, NRC became "a wholly-owned subsidiary" of Black Stone NWO and continued to do business under a different trade name. (Doc. 24–2, PageID 180 at ¶12). NRC "generated revenues as it had" before the sale, but now "enjoyed cost-savings by using the shared administrative services available through" Black Stone Operations. (*Id.*, PageID 180 at ¶¶13–14).

### 1. Merger

In November, 2015, Black Stone sold Black Stone Operations and its operating entities, including Black Stone NWO, to AFAM Acquisition, LLC for just over $40 million. (Doc. 11, PageID 98 at ¶30; Doc. 24–2, PageID 182 at ¶¶33–35; Doc. 24–6, PageID 326). After the merger, Black Stone NWO "remained a separate operating entity," and NRC remained a "wholly-owned subsidiary" of Black Stone NWO. (Doc. 24–2, PageID 182 at ¶35).

### 2. "Gross Proceeds" Calculation

It is undisputed that the AFAM merger constituted a "change of control" for purposes of the Phantom Equity Agreement. Accordingly, Black Stone undertook to calculate the "Gross Proceeds" of that transaction to determine the value, if any, of Venzke's phantom equity.

The total purchase price was $40,100.000. (Doc. 24–6, PageID 326).

As required by the Phantom Equity Agreement's definition of "Gross Proceeds," Black Stone NWO first deducted from that sum $13,015,838 in "liabilities, obligations and other indebtedness of Black Stone [NWO] not assumed by" AFAM. (Doc. 24–6, PageID 328). It then subtracted $1,579,670 in "transaction costs," as well as a further $8,000,000 for established

reserves. (*Id.*). Then, because Black Stone retained $70,836.30 in cash on hand, it added that sum

to the "Gross Proceeds" calculation, yielding a figure of $17,575,328.30. (*Id.*).

Because NRC was one of multiple "[o]perating [e]ntities under a common [p]arent"

organization (*i.e.*, Black Stone Operations), Black Stone NWO decided that "the proceeds from

the AFAM sale needed to be allocated to each of the [o]perating [e]ntities to determine the value

that NRC contributed to the transaction." (Doc. 24–6, PageID 328). Management relied on

NRC's EBITDA in the twelve-month period ending August 31, 2015 to gauge NRC's value

because EBITDA was "generally the main value driver for the AFAM transaction." (*Id.*).

Black Stone NWO then "determined that [Black Stone Operations'] costs should be

allocated to each of the [o]perating [e]ntities" based upon each entity's revenue. (Doc. 24–6,

PageID 328). Because revenue "is a measurement of activity at the [o]perating [e]ntity's level,"

Black Stone NWO's allocation method assumed that "each [o]perating [e]ntity consumes a

proportional share of [Black Stone Operations'] centralized functions." (*Id.*).

After so allocating proceeds and costs among the operating entities, Black Stone NWO

determined that NRC "did not contribute to the value upon which the NRC transaction was based

(EBITDA)[.]" (*Id.*, PageID 329). Rather, Black Stone NWO determined that NRC's EBITDA

"equaled negative $187,846.00." (*Id.*). Because NRC's share of the "gross proceeds" from the

merger was less than zero, Black Stone concluded that Venzke was not entitled to a payment for

his phantom equity interest.

### 3. Earnout Calculation

Sometime in 2016, Black Stone NWO calculated Venzke's "Earnout Amount" and

determined that he was not entitled to a payment under the Earnout Agreement. (Doc. 24–2,

PageID 183 at ¶40). According to management's calculations, NRC's 2015 adjusted EBITDA

was less than $800,000, the minimum earning that would trigger a payment under the Earnout Agreement. (Doc. 24–6, PageID 336).

#### 4. Venzke's Alleged Warranty Breaches

In March, 2015, Black Stone NWO sent Venzke a "Notice of Claims for Indemnification" regarding three alleged warranty breaches. (Doc. 24–2, PageID 199–203).

##### a. Uncollectible Accounts Receivable

Black Stone NWO claimed that it "found $80,502 of uncollectible Accounts Receivable." (Doc. 24–2, PageID 199). The company made ordinary and reasonable efforts to collect the accounts receivable that Venzke had transferred to it, but it ultimately wrote off $101,539.69 in accounts as uncollectible. (*Id.*, PageID 181 at ¶21).

##### b. Undisclosed Workers' Compensation Claims

Black Stone NWO also alleged that Venzke failed to disclose four Workers' Compensation claims that were pending against NRC when the sale closed.

After purchasing NRC, Black Stone NWO "became self-insured for Workers' Compensation claim[s]." (Doc. 24–1, PageID 180 at ¶15). While this change had certain financial advantages for Black Stone NWO, it also obligated Black Stone NWO to pay for claims that the State of Ohio would have paid (including the four allegedly undisclosed claims). (*Id.*, PageID 182 at ¶¶29 –31). Had Venzke disclosed those claims, Black Stone NWO maintains that it would have adjusted the purchase price downward by $100,226. (*Id.*, PageID 182 at ¶31).

##### c. Undisclosed Liabilities

Finally, Black Stone NWO audited the visit records of NRC's home healthcare aides and discovered that one aide committed fraud by forging "client names on . . . visit notes."

(Doc. 24–2, PageID 199). Black Stone NWO therefore concluded that NRC's submission of these claims, which totaled $182,347.80, to the State of Ohio for payment was improper. (*Id.*).

Based on the advice of counsel and auditors, Black Stone NWO "consider[ed] the suspected fraud to be an undisclosed liability" and "established an open reserve for the potential liability[.]" (Doc. 24–2, PageID 181 at ¶¶23–24). As of the summary judgment filings, no party has demanded reimbursement from Black Stone NWO.

### C. Litigation

Venzke filed this suit in May, 2017. He alleges that Black Stone NWO breached the Stock Purchase Agreement, the Phantom Equity Agreement, and the Earnout Agreement. By way of relief, Venzke seeks: 1) a payment of $356,890 under the Phantom Equity Agreement; 2) a payment of $200,000 under the Earnout Agreement; and 3) the release of the $200,000 held in escrow in accordance with the Stock Purchase and Escrow Agreements. (Doc. 1, PageID 5).

Black Stone NWO filed its answer and counterclaims in September, 2017.

It contends that Venzke breached the Stock Purchase Agreement by falsely warranting that NRC had no undisclosed liabilities, no undisclosed claims pending against it, and no uncollectible accounts receivable. (Doc. 11, PageID 100).[2]

### Standard of Review

"Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[2] Black Stone NWO also claimed that Venzke breached a warranty in the Stock Purchase Agreement by accepting a $30,000 distribution from NRC that was "outside of the Ordinary Course of Business." (Doc. 11, PageID 99 at ¶36). Black Stone NWO does not seek summary judgment on this claim, however, because of "expected factual disputes." (Doc. 24–1, PageID 155 n.5).

The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323. Once the movant carries its burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the nonmovant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

### Discussion

Venzke's and Black Stone NWO's claims turn on the language of four contracts: 1) the Phantom Equity Agreement; 2) the Earnout Agreement; 3) the Escrow Agreement; and 4) the Stock Purchase Agreement.

Because I am "confronted with [several] issue[s] of contractual interpretation," my role is "to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (2003). I must examine the contract "as a whole and presume that the intent of the parties is reflected" in the contract's language. *Id.* And I must "look to the plain and ordinary meaning of the language used in the [contract] unless another meaning is clearly apparent[.]" *Id.*

### A. Phantom Equity Payment

Venzke alleges that Black Stone NWO breached the Phantom Equity Agreement when it concluded that NRC's share of the gross proceeds of the AFAM merger was $0 and, accordingly, denied him a payment for his phantom equity interest. (Doc. 1, PageID 4 at ¶¶13–14; Doc. 28, PageID 611–17).

## 1. Parties' Arguments

Venzke claims that he is entitled to $356,890 for his phantom equity interest. (Doc. 28, PageID 616).

Venzke bases this calculation "on the percentage NRC's revenues bore to the total revenues of the Black Stone companies sold" to AFAM. (*Id.*). Because NRC generated 17.8% percent of Black Stone Operations' total revenues,[3] NRC's share of the gross proceeds generated by the AFAM merger transaction ($40,100,000) amounts to $7,137,800 ($40,100,000 x .178 = $7,137,800). And because the Phantom Equity Agreement entitles Venzke to five percent of the gross proceeds, Venzke contends that Black Stone NWO owes him $356,890 for his interest ($7,137,800 x .05 = $356,890).

Black Stone NWO responds that Venzke's calculation is inconsistent with the Phantom Equity Agreement's method for calculating "Gross Proceeds." (Doc. 24–1, PageID 169–71).

That document defines "Gross Proceeds" as the total amount paid for Black Stone NWO's equity minus liabilities not assumed by the buyer, transaction costs, and reserves established for contingent liabilities. (Doc. 1–2, PageID 57). Black Stone NWO argues that Venzke's calculations are flawed because they do not account for any of the deductions built into the definition of "Gross Proceeds."

Black Stone NWO further contends that the Phantom Equity Agreement permitted it to "make other equitable adjustments, in good faith, to the foregoing calculation[,]" including an adjustment allocating a proportionate share of Black Stone Operations' costs to Black Stone NWO and the other subsidiaries. (Doc. 1–2, PageID 57).

---

[3] This figure is not in dispute. (Doc. 24–6, PageID 342).

Invoking that provision, Black Stone NWO maintains that it was "reasonable to allocate administrative costs to the individual operating entities" within the family of Black Stone companies that AFAM acquired. (Doc. 24–1, PageID 170). This was so, the company contends, because Black Stone NWO "received services and support from a central source [*i.e.*, Black Stone Operations] and therefore avoided certain costs in its own operations." (*Id.*).

To demonstrate the reasonableness of this adjustment, Black Stone NWO relies on the expert report and opinions of Patrick Odell, a certified public accountant. (Doc. 24–6).

Odell opined to a reasonable degree of professional certainty that it was "appropriate for Management to allocate the Parent [*i.e.*, Black Stone Operations] costs among the Operating Entities [*i.e.*, Black Stone NWO and other subsidiaries] to operate as a going concern." (*Id.*, PageID 330). As Odell explained:

> While there is no mandatory professional standard for such an allocation, I have encountered similar allocations in other contexts. As general [*sic*] proposition, we are trying to assess how much of the Parent's resources are devoted to supporting the subsidiary. Without direct accounting for the subsidiary's usage, we look to for [*sic*] a financial indicator that can reasonably be tied to such usage. In this circumstance, Management used NRC's revenue as an indicator of NRC's usage of the Parent's resources and adjusted EBITDA.

> Based upon my professional experience with other transactions and allocation methods, I believe that revenue is an appropriate proxy to estimate usage of the Parent's services and thus, the percentage of the Parent's costs that should be allocated to the subsidiary. Based upon my professional experience with other transactions and negotiations of purchase prices, it is reasonable to allocate the Gross Proceeds to each Operating Entity based on each Operating Entity's EBITDA.

> Due to the subjectivity associated with the phantom equity calculation, I tested the calculation's reasonableness using other factors. For example, I considered the Operating Entity's [*i.e.*, Black Stone NWO's] headcount as an indicator to establish a consumption of the Parent's resources. In my experience, headcount is an appropriate factor for such allocations. When I tested Management's conclusions by comparing the EBITDA method with the Headcount method, the results again yielded negative EBITDA for NRC.

* * *

> Based upon my education, training, and professional experience, Management's assessments, my review of the same, and my testing of Management's conclusions using another allocation method, I agree to a reasonable degree of professional certainty that NRC did not contribute positive value to the AFAM transaction. Therefore, no Gross Proceeds should be allocated to NRC for purposes of the phantom equity calculation, and no payment is owed to Mr. Venzke under the [Phantom Equity Agreement].

(Doc. 24–6, PageID 330–31).

Because this calculation of "Gross Proceeds" yielded a negative value, Black Stone NWO argues that Venzke's phantom equity interest was worthless and that it is entitled to summary judgment on this claim.

Venzke replies that the Phantom Equity Agreement forecloses Black Stone NWO's calculation method. (Doc. 28, PageID 610–12).

According to Venzke, the contract "provides two entirely different methods for calculating any payment due to Venzke": 1) in the event of Venzke's death, "there is a formula based upon EBITDA"; but 2) in the even of a "change of control," "the payment due to Venzke is based upon gross proceeds." (*Id.*, PageID 610). Relying on the canon of *expressio unius est exclusio alterius*, Venzke maintains that, had he and Black Stone NWO "intended that payment due to Venzke in the event of a change of control would be determined by EBITDA, they would have included this in the relevant section" of the contract. (*Id.*, PageID 612).

Venzke also argues that Odell's report and conclusions are not "reliable" because: 1) Odell is biased, given that one of Black Stone's principals, David Brixey, owns the firm for which Odell works; 2) Odell relied on information that Black Stone NWO supplied and that Odell "neither audited nor independently verified"; and 3) Odell's report is internally inconsistent. (*Id.*, PageID 612–15).

## 2. Analysis

I agree that Black Stone NWO is entitled to summary judgment on Venzke's claim under

the Phantom Equity Agreement.

### a. Black Stone NWO Reduced "Gross Proceeds" According to the Phantom Equity Agreement's Definition of That Term

First, the Phantom Equity Agreement required Black Stone NWO to deduct from the

$40,100,000 sale price any retained liabilities, transaction costs, and established reserves when

calculating the "Gross Proceeds" figure. (Doc. 1–2, PageID 57). Black Stone NWO introduced

evidence establishing that it retained $13,015,838 in liabilities, incurred $1,579,670 in

transaction costs, and established $8,000,000 in reserves. (Doc. 24–6, PageID 342). The contract

also required Black Stone NWO to add to the "Gross Proceeds" figure any cash on hand, and

Black Stone NWO introduced evidence that it had $70,836.30 in cash on hand. (*Id.*).

Because Venzke cites no evidence tending to cast doubt on these figures, there is no

genuine dispute that the "Gross Proceeds" of the AFAM merger transaction were $17,575,328.[4]

---

[4] To be sure, Venzke argues in a sur-reply that it was improper for Black Stone NWO to deduct $2 million of the established reserves from the "Gross Proceeds" figure because those funds were ultimately returned to Black Stone NWO. (Doc. 33, PageID 748). But this argument fails for at least three reasons. First, Venzke forfeited this argument by raising it for the first time in his sur-reply. Although I granted Venzke leave to file the sur-reply (over Black Stone NWO's objection that it had not raised any new arguments in its reply brief, and thus that the sur-reply was improper), I now conclude that Venzke should have raised his challenge to Black Stone NWO's reserves calculation in his opposition brief. Black Stone NWO's motion for summary judgment argued that it was proper to deduct $8 million in established reserves. (Doc. 24–1, PageID 160–62). It was therefore incumbent upon Venzke to come forward with evidence establishing the "presence of a genuine dispute" as to the propriety of that deduction, Fed. R. Civ. P. 56(c)(1)(B), but Venzke conceded that it was proper for Black Stone NWO to deduct reserves and did not challenge the $8 million figure. (Doc. 28, PageID 610–17).

Second, and setting aside the forfeiture, the Phantom Equity Agreement provided that the "calculation of the Gross Proceeds shall be performed as of the date of the Change of Control." (Doc. 1–2, PageID 57). For that reason, whether Black Stone NWO ultimately collected any of the established reserves after the merger is irrelevant. (Venzke does not cite any evidence to establish that the reserves were returned to Black Stone as of the date of the change of control.)

### b. Black Stone NWO Exercised Its Contractual Authority
### to Adjust "Gross Proceeds" by Allocating Costs to NRC

Second, the Phantom Equity Agreement's formula for calculating "Gross Proceeds" yields only the "Gross Proceeds" of the AFAM merger transaction. Nothing in the contract specified how Venzke and Black Stone NWO were to determine NRC's share of those proceeds.

As both sides recognize, the Phantom Equity Agreement did "not explicitly contemplate a change of control transaction involving entities other than NRC." (Doc. 24–6, PageID 329); (Doc. 28, PageID 611) (Venzke's acknowledgement that, because "the subject transaction involved a sale of the company (NRC) not as a distinct independent entity, but rather a constituent part of a larger entity," there is no "stated formula which, when applied, would result in a determination of Venzke's interest").

Nevertheless, the contract states (and Venzke does not deny) that Black Stone NWO had "the authority to . . . make other equitable adjustments, in good faith," to the "Gross Proceeds" calculation. (Doc. 1–2, PageID 57). Black Stone NWO exercised that authority by allocating a share of Black Stone Operations' costs to each of its subsidiary entities, including NRC. (Doc. 24–6, PageID 328–29). Management did this after first allocating a share of the gross proceeds of the AFAM transaction to NRC based on its EBITDA. (Doc. 24–6, PageID 328).

Black Stone NWO's expert, Odell, opined, moreover, that proceeding in that fashion was "reasonable" and "appropriate." (Doc. 24–6, PageID 329, 330, 331).

---

Third, and in any event, Venzke does not cite any "particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), to support his assertion that Black Stone NWO in fact received the $2 million in reserves. (Doc. 33, PageID 748).

As Odell explained, these steps of the "Gross Proceeds" calculation "involve[d] more discretion because the [Phantom Equity Agreement] is silent as to an allocation methodology."[5] (*Id.*, PageID 329). Regarding management's decision to use EBITDA to allocate NRC's share of the AFAM merger's proceeds, Odell knew "through [his own] experience" that "many buyers value the target by assessing the target's historic and projected EBITDA[.]" (*Id.*, PageID 331). This was so, Odell explained, because "[b]uyers consider EBITDA to be an indication of their ability to operate a company profitably after closing a transaction." (*Id.*).

Regarding the allocation of Black Stone Operations' costs, Odell opined that NRC's "revenue is an appropriate proxy to estimate usage of [Black Stone Operations'] services and thus, the percentage of [Black Stone Operations'] cost[s] that should be allocated" to NRC. (Doc. 24–6, PageID 330). Because NRC generated 17.8% of the Black Stone entities' revenues, management allocated 17.8% of its costs to NRC. (*Id.*, PageID 342).

Finally, Odell tested the reasonableness of management's calculations by using NRC's "headcount as an indicator to establish a consumption of the Parent's resources." (Doc. 24–6, PageID 330). Using this method, Odell found, likewise yielded a negative value.

This evidence, which establishes that Black Stone NWO exercised its power under the Phantom Equity Agreement to adjust the "Gross Proceeds," and that the adjustments management made to allocate costs were "reasonable" and "appropriate," shows "the absence of a genuine issue of material fact." *Celotex Corp.*, *supra*, 477 U.S. at 322. It then became Venzke's burden to "set forth specific facts showing there is a genuine issue for trial," *Liberty Lobby*, *supra*, 477 U.S. at 250, but Venzke has not carried that burden.

---

[5] For his part, Odell "kn[e]w of no specific professional standards for performing this allocation." (Doc. 24–6, PageID 329).

### c. Venzke Has Not Shown the Existence of a Genuine Issue of Material Fact

Venzke makes no claim that the cost allocation was not an "equitable adjustment" for purposes of the Phantom Equity Agreement. (Doc. 33, PageID 610–17). Nor does he argue that Black Stone NWO failed to act in good faith when it made that adjustment. (*Id.*).

Rather, he contends that the Phantom Equity Agreement did not allow Black Stone NWO to use NRC's EBITA when calculating NRC's share of the "Gross Proceeds" from the AFAM merger. He also contends that Odell's opinion and analysis are unreliable. The former argument has no basis in the contract, and the latter has none in the evidence.

### i. The Contract Is Silent on the Allocation Issue

Contrary to Venzke's argument, the Phantom Equity Agreement did not prohibit Black Stone management from relying on NRC's EBITA when it allocated a proportionate share of Black Stone Operations' costs onto NRC.

As discussed above, *supra* at 14, the Phantom Equity Agreement did not contemplate a sale of NRC as part of a package with the other Black Stone subsidiaries. For that reason, the contract contains no rule specifying how Black Stone NWO was to apportion the "Gross Proceeds" among the operating entities, let alone a rule forbidding management from relying on NRC's EBITDA in allocating a share of Black Stone Operations' costs onto NRC.

The only part of the contract that provided any guidance on these issues was the provision authorizing Black Stone NWO to make "other equitable adjustments, in good faith," to the "Gross Proceeds" calculation. (Doc. 1–2, PageID 57). Under that language, the sole limitation on management's power to act was the obligation that any adjustment it made be in good faith. Venzke has introduced no evidence, however, that would permit a reasonable jury to find that Black Stone violated that duty.

Venzke's reliance on the *expressio unius* canon to show that the contract disallowed Black Stone NWO from relying on NRC's EBITDA has no merit.

"This Latin maxim means that the expression of one or more persons or things implies the exclusion of those not expressed." *Mercer v. 3M Precision Optics*, 181 Ohio App. 3d 307, 310 (2009). "Typically, expressio unius est exclusio alterius is applied when there is a listing of items in an associated group or series, which 'justif[ies] the inference that items not mentioned were excluded by deliberate choice, not inadvertence.'" *Id.* (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)).

Venzke is correct that the parties "elect[ed] asymmetric calculation methods" to determine the value of his phantom equity interests: NRC's EBITDA in the event of his death, and "Gross Proceeds" in the event of a change of control. (Doc. 28, PageID 612). But Venzke's conclusion – that EBITDA was "entirely misguided and inapplicable" when it came to apportioning a share of Black Stone Operations' costs to NRC – does not follow from his premise, nor from applying the *expressio unius* canon.

Because the Phantom Equity Agreement's definition of "Gross Proceeds" yielded only the proceeds from the AFAM merger transaction, Black Stone NWO needed a formula to allocate those proceeds "to each of the Operating Entities to determine the value that NRC contributed to the transaction." (Doc. 24–6, PageID 328). Exercising its authority to make "equitable adjustments" for "unforeseen circumstances" in "good faith" (Doc. 1–2, PageID 57), management elected to: 1) apportion those "Gross Proceeds" among the subsidiaries based on each entity's EBITDA; and 2) allocate a proportionate share of Black Stone Operations' costs to each entity based on the entity's revenue. (Doc. 24–6, PageID 330–31).

Perhaps the *expressio unius* doctrine would have foreclosed Black Stone NWO from relying on NRC's EBITDA if another part of the contract either spoke to allocation methods or listed those situations in which it was permissible for Black Stone NWO to consider NRC's EBITDA. After all, "the canon depends on identifying *a series of two or more terms or things that should be understood to go hand in hand*, which [is] abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) (emphasis supplied).

But the Phantom Equity Agreement contains no such language. Rather, Black Stone NWO acted in accordance with an express contractual provision (authority to make good faith deductions) while dealing with a subject on which the contract was completely silent. For that reason, the *expressio unius* doctrine does not support Venzke's position.

### ii. Venzke Cites No Rule 56 Evidence to Undermine Odell's Conclusions

"[S]ummary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's witnesses." *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). In this case, however, Venzke cites no evidence that would permit a rational fact-finder to discredit Odell's conclusions or find that Black Stone NWO acted in bad faith.

First, Venzke accurately observes that Odell based his opinions on the data that Black Stone NWO gave him, and that Odell did not independently verify that information. (Doc. 24–6, PageID 318 at ¶7).

But Venzke does not cite any evidence that would permit a rational jury to draw the conclusion that Venzke would like them to draw: Black Stone NWO skewed the data on which Odell relied so as to deny Venzke a phantom equity payment. (Doc. 33, PageID 28 at 613)

(Venzke's opposition brief making this argument). Without such evidence, a jury could find that Black Stone NWO fudged the numbers only through pure speculation – which is no basis to avoid a grant of summary judgment. *Bradley v. Wal-Mart Stores East, LP*, 587 F. App'x 863, 866 (6th Cir. 2014) ("A properly supported motion for summary judgment will not be defeated by conclusory allegations, speculation and unsubstantiated assertions.").

Second, Venzke claims that Odell is biased because he "essentially works for David Brixey, one of Black Stone's principals." (Doc. 28, PageID 612).

The record shows that Odell works for "Brixey & Meyer Capital" (Doc. 24–6, PageID 317 at ¶4), but Venzke cites no evidence to show that Brixey is one of Black Stone's principals. (Doc. 28, PageID 612–13) (Venzke's opposition brief discussing Odell's alleged bias). Accordingly, he has not satisfied his burden to introduce evidence from which a jury could find that Odell is biased. *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010) ("The non-moving party . . . must present sufficient evidence from which a jury could reasonably find for him.").

Even assuming that Venzke had carried his Rule 56 burden, the evidence that Odell is biased (because he arguably had an interest in pleasing his boss, Mr. Brixey, by endorsing Black Stone NWO's conclusion vis-à-vis the "Gross Proceeds" calculation), is not sufficient to create a genuine factual dispute.

"'[W]hen challenges to witness[ ] credibility are all that a plaintiff relies on, and he has shown no independent facts – no proof – to support his claims, summary judgment in favor of the defendant is proper.'" *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013) (quoting *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)).

As already discussed, *supra* at 14, 16, Venzke has cited no evidence to support his position on the critical factual question: whether Black Stone NWO acted in good faith when it exercised its undisputed authority to make "equitable adjustments" to the "Gross Proceeds" calculation and allocated a proportionate share of Black Stone Operations' costs to NRC. Consequently, I have no basis to conclude that a reasonable jury could find that Black Stone NWO's allocation of proceeds and costs to NRC was anything other than "reasonable" and "appropriate."[6]

I of course recognize that "[c]ourts may not resolve credibility disputes on summary judgment." *Dawson*, *supra*, 528 F. App'x at 452 (citing *Liberty Lobby*, *supra*, 477 U.S. at 255). But "[t]his rule of procedure typically applies where there is a genuine conflict in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Id.* (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2726, at 447 (3d ed. 1998)).

Here, however, I am not resolving any such credibility dispute, because there is no true conflict in the evidence. Indeed, there is no evidence at all (at least Venzke has cited none) that Black Stone NWO's equitable adjustment was anything other than in good faith.

Third, there is no basis for Venzke's claim that Odell's report is internally contradictory.

To support this contention, Venzke cites Odell's conclusion that "Management properly reduced the value of Mr. Venzke's 5% phantom equity to a net value of $0.00 by *applying the*

---

[6] Venzke does argue that Black Stone NWO should have calculated NRC's share of the "Gross Proceeds" based on the revenue it contributed to the Black Stone family of companies. (Doc. 28, PageID 616). However, he cites no evidence to show that Black Stone NWO's failure to utilize that method was in bad faith. (*Id.*). Moreover, Odell explained that "using revenue may be considered reasonable, it is not reasonable to do without accounting for the costs incurred to achieve such revenue. Mr. Venzke's calculations do not account for costs incurred, and therefore are overstated." (Doc. 24–6, PageID 331). Venzke cites no evidence to challenge that conclusion, which supports Black Stone NWO's case that its allocation method was in good faith.

*formula described in the Phantom Equity Agreement*." (Doc. 24–6, PageID 320) (emphasis supplied). He then points to Odell's later statement that the Phantom Equity Agreement was "silent as to an allocation methodology," and that the contract accordingly gave Black Stone management "more discretion." (*Id.*, PageID 329). Because these two statements are supposedly contradictory – how could the calculation be reduced to a "formula" when management needed to exercise its discretion? – Venzke maintains that Odell's opinions cannot support the motion for summary judgment.

Even viewing these statements in the most negative light, they do not establish a genuine factual dispute as to the matters set forth in Odell's declaration.

That document is clear (and in it Odell says clearly) that Black Stone NWO's calculation of the "Gross Proceeds" of the AFAM merger transaction yielded "clear outcomes because such procedures do not involve a significant amount of discretion" and the Phantom Equity Agreement "describes several straight mathematical steps for determining Gross Proceeds (e.g., reducing transaction price by the amount incurred for transaction costs)." (Doc. 24–6, PageID 329). On the other hand, as Odell repeatedly acknowledged, the contract did "not explicitly contemplate a change of control transaction involving entities other than NRC," which meant that management had "more discretion" in allocating costs and proceeds to NRC. *Id.*, PageID 329–30).

Because the substance of Odell's report establishes that management had no discretion in calculating some parts of the "Gross Proceeds" figure and significant discretion in making "equitable adjustments" to that figure, there is no contradiction in the report, let alone a contradiction that could support a rational jury's outright rejection of Odell's opinions, calculations, and conclusions.

For these reasons, Black Stone NWO is entitled to summary judgment on Venzke's claim under the Phantom Equity Agreement.

## B. Earnout Claim

Venzke alleges that Black Stone NWO breached the Earnout Agreement. (Doc. 1, PageID 5 at ¶18). According to Venzke, if "the results of NRC's financial operations" after the sale to Black Stone NWO were "consistent with previous years," then "the payment to which he is entitled to under the Earnout Agreement formula is approximately $200,000." (*Id.*)

### 1. Parties' Arguments

According to Venzke, "a calculation is only as valid as the numbers/information used to make it." (Doc. 28, PageID 622). He contends that Black Stone NWO "had the unfettered ability to charge NRC with whatever management fees, general overhead expenses, or other intercompany charges it could in order to dilute NRC's value[.]" (*Id.*, PageID 621–22). That Black Stone NWO engaged in such bad-faith calculation of NRC's 2015 Adjusted EBITDA, Venzke maintains, "is conceded by [David Tramontana, the CEO of a Black Stone NWO parent company] where he stated [in his declaration] that 'we needed to make an equitable adjustment.'" (*Id.*, PageID 623).

Venzke also contends that Black Stone NWO breached the Earnout Agreement by failing to provide the required "Computation Notice" – setting forth how Black Stone NWO calculated NRC's 2015 Adjusted EBITDA – within the contractually required ninety-day window. (Doc 28, PageID 622).

Black Stone NWO responds that the undisputed evidence established that it properly calculated NRC's Adjusted 2015 EBITDA and determined that it was less than $800,000, the minimum threshold that would trigger an earnout payment. The company again relies on Patrick

Odell, who opined "to a reasonable degree of professional certainty that NRC did not achieve the minimum Adjusted EBITDA thresholds required by the Earnout Agreement to be eligible for an earnout payment." (Doc. 24–6, PageID 336).

Odell used "two methods" to calculate NRC's 2015 Adjusted EBIDTA because "the Earnout Agreement did not contemplate an ownership change in 2015 and did not provide a specific methodology for determining Adjusted EBITDA based on a partial year." (*Id.*).[7]

He first calculated the earnout "based on the full year ended [*sic*] December 31, 2015 (i.e., the actual full-year's results)." (*Id.*, PageID 335). According to Odell, this method "adhere[d] to the Earnout Agreement's language even though NRC's ownership changed, and new ownership operated NRC for November and December 2015." This method established that NRC's 2015 Adjusted EBITDA was $511,619, shy of the $800,000 threshold. (*Id.*, PageID 336).

Odell then calculated the Adjusted EBITDA by taking "the financial values as of October 31, 2015 and annualized them based on the assumption that NRC would continue to operate in November and December as it had for the previous ten months." (Doc. 24–6, PageID 335–36). Under that scenario, Odell calculated that the 2015 Adjusted EBITDA amounted to $623,797. (*Id.*, PageID 336).

Because Venzke has no evidence to contradict or otherwise rebut these calculations, Black Stone NWO contends that it is entitled to summary judgment on Venzke's earnout claim.

## 2. Analysis

The Earnout Agreement provided that Venzke would not receive an earnout payment unless NRC's 2015 "Adjusted EBITDA" was at least $800,000. As Odell's calculations show, two different methods for calculating the 2015 Adjusted EBITDA yielded sums that were below

---

[7] The AFAM merger occurred on November 4, 2015. (Doc. 24–2, PageID 182 at ¶¶33–35).

the $800,000 threshold. Venzke has not cited any evidence that would rebut either Odell's methodology, the data on which he relied, or the conclusions he reached. There is, accordingly, no genuine dispute of material fact on the question of NRC's 2015 Adjusted EBITDA, and Black Stone NWO is entitled to judgment as a matter of law.

Venzke's counter-arguments do not warrant a different result.

First, Venzke cites no evidence to support his contention that Black Stone NWO in fact exercised its "unfettered ability" to charge improper expenses to NRC so as to reduce its 2015 Adjusted EBITDA. Absent such evidence, Venzke's argument is pure speculation. *Marks One Car Rental, Inc. v. Auto Club Grp. Ins. Co.*, 761 F. App'x 516, 521 (6th Cir. 2019) ("nonmoving party may not use speculation, conjecture, or fantasy to avoid summary judgment") (internal quotation marks omitted).

Second, while Tramontana did testify that Black Stone NWO "needed to make an equitable adjustment," his declaration establishes that this testimony had nothing to do with the Earnout Agreement. (Doc. 24–2, PageID 183 at ¶43). Rather, Tramontana made that statement when he was discussing Black Stone NWO's calculation of "Gross Proceeds" under the Phantom Equity Agreement:

> Given the overall corporate structure within which [Black Stone NWO] operated (i.e., generating revenue while receiving administrative services from Black Stone Operations), management determined that we needed to make an equitable adjustment to account for the cost of BSO services [Black Stone NWO] consumed.

(Doc. 24–2, PageID 183 at ¶43).

Third, even assuming that Black Stone NWO breached the Earnout Agreement by failing to provide Venzke with a Computation Notice within ninety days after the end of the earnout period,[8] that failure does not have any effect on Venzke's entitlement to an earnout payment.

For one thing, the contract itself is silent on the effect of such failure by Black Stone NWO. For another, it is undisputed that both Venzke and his counsel had a copy of Black Stone NWO's earnout calculation no later than May 20, 2016 (about fifty days after the end of the ninety-day window Black Stone NWO had to deliver the Income Calculation). (Doc. 25–1, PageID 567–68). With that calculation in hand, Venzke had notice of Black Stone NWO's basis for refusing an earnout payment and an opportunity to challenge it. As discussed above, however, he has introduced no evidence that would permit a rational fact-finder to conclude that Black Stone NWO miscalculated NRC's 2015 Adjusted EBITDA.

For all these reasons, Black Stone NWO is entitled to summary judgment on Venzke's claim under the Earnout Agreement.

## C. Black Stone NWO's Counterclaims

### 1. Uncollectible Accounts Receivable

Venzke warranted that every account receivable reflected on NRC's balance sheet "has been or will be collected in full, without any set-off, within ninety days after the day on which it first becomes due and payable." (Doc. 1–1, PageID 26).

### a. Parties' Arguments

Black Stone NWO claims that Venzke breached this warranty. It points to Tramontana's declaration that the company "made ordinary and reasonable efforts to collect all Accounts Receivable transferred to it in the transaction but was unable to do so." (Doc. 24–2, PageID 181

---

[8] Venzke cites no evidence to support this assertion. (Doc. 28, PageID 622).

at ¶21). According to Tramontana, Black Stone NWO "wrote off $101,539.69 in Accounts Receivable that Mr. Venzke had warranted[.]" (*Id.*, PageID 181 at ¶22). Odell added that, of the accounts receivable at issue, "$70,725.68 . . . was greater than 90 days old when the transaction closed." (Doc. 24–6, PageID 338) (emphasis omitted).

Venzke responds that Black Stone NWO is not entitled to summary judgment because it "failed to comply with the indemnification procedures" in the Stock Purchase Agreement, thereby denying him "an opportunity to participate in any potential resolution" of the issue. (Doc. 28, PageID 619). He also claims that there is "ample evidence that Black Stone simply failed to use ordinary and customary industry standards in attempting to collect these accounts[.]" (*Id.*).

Venzke then faults Black Stone NWO for not producing any "Medicare denial letters which would (i) provide proof that it did not receive payment and (ii) provide a reason for the denial." (*Id.*, PageID 619–20). Finally, Venzke avers that, "[h]istorically, NRC collected over ninety-seven percent of its accounts receivable," such that it is unlikely that Black Stone NWO could not collect the disputed accounts receivable. (Doc. 28–1, PageID 629 at ¶10).

### b. Analysis

To prevail on its claim that Venzke breached a warranty in the Stock Purchase Agreement, Black Stone NWO must prove "(1) the existence of a contract, (2) that [Black Stone NWO] fulfilled its obligations, (3) that [Venzke] failed to fulfill [his] obligations, and (4) that damages resulted from [Venzke's] failures." *Carr v. Acacia Country Club Co.*, 2012-Ohio-1940, ¶37 (Ohio App. 2012).

There is no dispute that Venzke and Black Stone NWO were parties to the Stock Purchase Agreement or that Venzke warranted that all accounts receivable had been collected or would be collectible in full within ninety days after their due dates. (Doc. 1–1, PageID 26).

### i. The Notice and Indemnification Procedures Do Not Apply

Although Venzke claims that Black Stone NWO did not fulfill its obligations under the Stock Purchase Agreement's notice and indemnification provisions, the Stock Purchase Agreement makes clear that those provisions do not apply to Black Stone NWO's claim regarding the accounts receivable.

Venzke relies on Section 5.8 of the contract, "Procedure for Indemnification – Third-Party Claims." (Doc. 1–1, PageID 46); (Doc. 28, PageID 620) (Venzke's opposition brief invoking Section 5.8). This section requires that, after "an indemnified party" – defined elsewhere in the contract as Black Stone NWO and its affiliates (Doc. 1–1, PageID 13, 44) – receives "notice of the commencement of any Proceeding, or recoupment or payment or claim for repayment from a health insurance payor, against it," Black Stone NWO must notify the indemnifying party –Venzke – of the claim. (*Id.*, PageID 46).

Regarding the accounts receivable claim, however, Black Stone NWO did not receive notice from a third-party of a claim against it. Instead, Black Stone NWO attempted to collect the accounts, was unable to do so, and resorted to its remedies under Section 5.2 of the Stock Purchase Agreement. Under that provision, styled "Indemnification and Payment of Damages by Seller," Venzke must "indemnify and hold harmless" Black Stone NWO for "any loss, liability, claim, [or] damage" arising from, *inter alia*, "any Breach of any representation or warranty made by [Venzke] in this Agreement." (Doc. 1–1, PageID 44). Nothing in that section required Black

Stone NWO to notify Venzke of its warranty claim or try to mediate the claim with him before filing suit. (*Id.*, PageID 44–45).

For that reason, Black Stone NWO's supposed failure to comply with Section 5.8's notice procedures does not foreclose the company's claim.

### ii. There Is No Genuine Dispute That Venzke Breached the Warranty

Black Stone NWO's evidence, in the form of declarations from Tramontana and Odell, establishes that there is no genuine dispute that Venzke breached the warranty concerning the collectibility of NRC's accounts receivable. Their declarations show that Black Stone used commercially reasonable collection methods but was unable to collect $101,539.60 in accounts receivable. (Doc. 24–2, PageID 181 at ¶¶21–22; Doc. 24–6, PageID 338). Indeed, Odell's declaration establishes that nearly seventy percent of those accounts were older than ninety days when the Venzke-Black Stone NWO transaction closed – itself a violation of the warranty. (Doc. 24–6, PageID at 338).

The burden under Rule 56 therefore shifted to Venzke to show that a genuine issue remains for trial, but Venzke's evidence is not sufficient to carry that burden.

First, Venzke cites no evidence to support his argument that Black Stone failed to utilize "ordinary and customary industry standards" to collect the disputed accounts. (Doc. 28, PageID 619–20) (Venzke's opposition brief making this argument). Accordingly, Black Stone NWO's evidence on this point stands undisputed.

Second, Venzke's evidence that NRC had "historically" collected ninety-seven percent of its accounts receivable is not responsive to Black Stone NWO's evidence that $101,539.60 of the accounts receivable it acquired from NRC were presently uncollectible, more than ninety days old at the time of the closing, or both. A jury that accepted Venzke's testimony could find, for

example, that the disputed accounts fell within the three percent that NRC had been unable to collect. Or it could find that the historical collection rate was not representative of the specific accounts receivable at issue. Absent anything more concrete from Venzke, a jury could only speculate that the disputed accounts were, in fact collectible. *Bradley*, *supra*, 587 F. App'x at 866 ("speculation" cannot overcome a properly supported motion for summary judgment).

Third, Black Stone NWO's failure to produce Medicare denial letters to support its claim is irrelevant. Nothing in the Stock Purchase Agreement required Black Stone NWO to introduce such evidence to prove that a given account was in fact uncollectible. (Doc. 1–1, PageID 26, 44).

Because Black Stone NWO has introduced undisputed evidence that Venzke breached this warranty, it is entitled to summary judgment.

## 2. Workers' Compensation Claims

Venzke also warranted that, at the time of the sale, there was "no pending Proceeding" against NRC besides those listed in a "Disclosure Schedule" attached to the Stock Purchase Agreement. (Doc. 1–1, PageID 35). For purposes of the Stock Purchase Agreement, "Proceeding" meant "any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental body or arbitrator." (*Id.*, PageID 15).

### a. Parties' Arguments

Black Stone NWO contends that Venzke breached this warranty by failing to disclose four pending Workers' Compensation claims.

According to Black Stone NWO, the company "learned of many undisclosed Workers' Compensation claims" after it purchased NRC. (Doc. 24–2, PageID 181 at ¶28). In its March,

2015 "Notice of Claims for Indemnification," Black Stone NWO listed the four "pending workers' compensation claims, for which the Bureau of Workers' Compensation [ ] and/or Industrial Commission had ordered the payment of benefits." (*Id.*, PageID 200). Tramontana testified that Black Stone NWO "had no knowledge of such ongoing claims and could not discover claims in due diligence and Mr. Venzke failed to disclose such claims." (*Id.*, PageID 182 at ¶30).

Venzke defends against this claim by asserting, first, that NRC "was in full compliance with the Ohio Bureau of Workers' Compensation ("OBWC") and that NRC never paid any amounts outside the premiums paid to the OBWC[.]" (Doc. 28–1, PageID 629 at ¶7). He then argues that it was "simply absurd for Black Stone to claim that it was unaware of the existence of numerous NRC's workers' compensation claims as the premiums were substantial and shown on the financial information provided to Black Stone during its due diligence." (Doc. 28, PageID 618).

As to Black Stone NWO's alleged damages, Venzke contends that Black Stone NWO cannot establish a "causative nexus between alleged non-disclosure and its alleged loss." (*Id.*, PageID 618). This is so, Venzke maintains, because Black Stone NWO's loss is due solely to its decision to become self-insured. (*Id.*, PageID 617).

Finally, Venzke disputes that a Workers' Compensation claim qualifies as a pending "Proceeding" for purposes of the Stock Purchase Agreement.

### b. Analysis

Black Stone NWO's evidence establishes that NRC failed to disclose four pending Workers' Compensation claim. (Doc. 24–2, PageID 181–82 at ¶¶28, 30; *id.*, PageID 200).

Nothing in Venzke's opposition brief or affidavit, moreover, creates a genuine factual dispute as to the non-disclosure. Venzke did not testify or cite any evidence showing that NRC disclosed the claims. He argues only that Black Stone NWO should have inferred, from NRC's "substantial" Workers' Compensation premiums, that one or more claims were pending against the company. (Doc. 28, PageID 618). He also contends that NRC fully complied with the Bureau of Workers' Compensation's rules and regulations.

But this evidence would not permit a rational finding that NRC disclosed the pending claims. Regardless of whether NRC's premiums were high, Venzke warranted that he had disclosed all pending "Proceedings" against NRC, and he cites no evidence showing that NRC disclosed the four claims at issue. Likewise, NRC could have fully complied with all applicable rules and regulations, but still have Workers' Compensation claims pending against it.

Nor is there merit to Venzke's argument that the Workers' Compensation claims do not qualify as a "pending Proceeding" against NRC.

The Stock Purchase Agreement broadly defined "Proceeding" to mean "any action . . . hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body." (Doc. 1–1, PageID 15). A claim for Workers' Compensation falls comfortably within that definition, since it is, at the very least, an "action" that was "commenced, brought, conducted, or heard by or before" a "Governmental Body": the Bureau of Workers' Compensation.

Tramontana's declaration establishes, moreover, that the disputed claims had been pending against NRC since either 2002 (two claims), 2011, and 2012; that the claims were open and ongoing when the sale closed; and that in each case the Bureau of Workers' Compensation

had ordered the payment of benefits, including temporary total disability benefits. (Doc. 24–2, PageID 181–82 at ¶¶28–32; *id.*, PageID 200–01).

Finally, while Black Stone NWO is entitled to summary judgment as to Venzke's breach of the warranty, I agree with Venzke that summary judgment is inappropriate as to causation and damages.

It is undisputed that Black Stone NWO became liable for the Workers' Compensation claims only after it became self-insured for purposes of such claims. As Tramontana explained, Black Stone NWO's status as self-insured meant that it was "responsible for paying certain claims that otherwise 'roll off' of the experience rating for State-insured participants in the system," including "many claims for permanent total disability or for permanent partial disability." (Doc. 24–2, PageID 180 at ¶17, PageID 182 at ¶29).

A reasonable fact-finder could conclude that this decision, made unilaterally by Black Stone NWO to achieve cost savings (*id.*, PageID 180 at ¶17), proximately caused (or was at least one proximate cause) of Black Stone NWO's loss: absent the change in insurance status, Black Stone NWO would not have been liable to pay the pending claims. *See Claris, Ltd. v. Hotel Dev. Servs., LLC*, 2018-Ohio-2602, ¶28 (Ohio App. 2018) ("it is axiomatic that damages must be the natural and proximate result of the defendant's breach").

In sum, Black Stone NWO is entitled to summary judgment as to Venzke's liability for breaching the warranty regarding undisclosed "Proceedings," but it is not entitled to summary judgment as to causation or damages.

### 3. Undisclosed Liability for Fraud

Finally, Venzke warranted that NRC "has no liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) except for

liabilities and obligations" set forth in a disclosure schedule and interim balance sheets. (Doc. 1–1, PageID 26).

### a. Parties' Arguments

Black Stone NWO argues that Venzke breached this warranty by not disclosing that one of NRC's home health care aides "could be accused of fraud, NRC might have to report the issue to the State of Ohio, and that the State of Ohio and third-party payors could demand reimbursement[.]" (Doc. 24–1, PageID 172).

In support, Black Stone NWO relies on Tramontana's testimony that he was "familiar with" the company's "investigation of, audit, and identification of suspected fraud" by one of NRC's aides. (Doc. 24–2, PageID 181 at ¶22). This investigation established that the aide had forged "client names" on the "visit records" that the aide maintained between December, 2008 and March, 2014. (*Id.*, PageID 199–200). Because of the aide's forgeries, Black Stone NWO estimated that it could be liable for $182,347.80 in fraudulent billings that NRC had submitted and for which it had received payment. (*Id.*, PageID 200).

Acting on the advice of its counsel and auditors, Black Stone NWO established an open reserve to satisfy any demands for repayment. (Doc. 24–2, PageID 181 at ¶24). The company explains that it believes that such claims for repayment would be subject to a six-year statute of limitations that will expire in March, 2020. (*Id.*, PageID 181 at ¶26). Black Stone NWO therefore asks me to find that Venzke breached this warranty, but hold in abeyance any decision as to damages until the March, 2020 expiration of the statute of limitations.

Venzke responds that Black Stone NWO is not entitled to summary judgment because it failed to give him timely notice of the indemnification claims, as the Stock Purchase Agreement required. (Doc. 28, PageID 624). He contends that, given "Black Stone's breach of the

indemnification notice procedures, it would be extremely unfair to . . . if Black Stone were allowed to unilaterally resolve the claim and hold Venzke responsible for it." (*Id.*).

**b. Analysis**

Black Stone NWO's evidence establishes that Venzke failed to disclose this liability, and that the failure exposed Black Stone to a potential loss of $182,347.80. Venzke cites no evidence tending to show there is a factual dispute as to these issues, so Black Stone NWO is entitled to judgment as a matter of law on the issue of Venzke's breach of the warranty.

However, the issue of damages, if any, is not yet ripe for decision, given Black Stone NWO's admission that no party has made a reimbursement claim stemming from the home healthcare aide's alleged fraud. I will therefore defer a decision on damages pending further developments, including a status/scheduling conference with counsel.

**D. Escrow Claims**

Finally, Venzke seeks the return of $200,000 in escrow funds, contending that Black Stone NWO has not presented a valid indemnification claim.

It is undisputed that, in April, 2016, the parties agreed "to reduce the Escrow Funds [by] distributing $37,000 to Mr. Venzke pursuant to" a partial settlement of claims not relevant here. (Doc. 24–2, PageID 183 at ¶37). The escrow fund therefore stands at $163,000, but ordering a return of that sum to Venzke now would be inappropriate, given that Black Stone NWO has obtained summary judgment on many of its claims, and its damages may exceed the amount in escrow.

## Conclusion

It is, therefore,

ORDERED THAT:

1.      Black Stone NWO's motion for summary judgment (Doc. 24) be, and the same

hereby is granted. Black Stone NWO is entitled to judgment as a matter of law on:

     A.      Venzke's breach of contract claim under the Phantom Equity Agreement;

     B.      Venzke's breach of contract claim under the Earnout Agreement;

     C.      Black Stone NWO's breach of warranty claim regarding the uncollectible

        accounts receivable;

     D.      Black Stone NWO's breach of warranty claim, but as to liability only,

        regarding the undisclosed Workers' Compensation claims; and

     E.      Black Stone NWO's breach of warranty claim, but as to liability only,

        regarding the undisclosed fraudulent billings.

2.      The parties' escrow agent be, and the same hereby is, directed to retain the

$163,000 in escrow monies in its possession pending further court order.

3.      Telephonic status/scheduling conference set for February 24, 2020 at 9:00 a.m.

using the court's conference line (1-877-336-1839  Access Code  8856866). The

parties should be prepared to discuss the remaining claims and what steps, if any,

need to be taken to make this case trial-ready.

4.      The parties shall file status report(s) no later than ten days before the date of the

telephonic status/scheduling conference.

So ordered.

                     /s/ James G. Carr
                     Sr. U.S. District Judge